**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0654n.06**
**Filed: August 28, 2006**

**No. 05-5879**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Joe W. NELSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| COMMISSIONER OF SOCIAL SECURITY, | ) | District of Tennessee |
| | ) | |
| Defendant-Appellee. | ) | |

Before:        BOGGS, Chief Judge; COLE, Circuit Judge; and ROSEN, District Judge.[*]

PER CURIAM.  Plaintiff Joe W. Nelson ("Nelson") appeals from a district court decision affirming the Commissioner of Social Security's denial of Nelson's application for Social Security disability insurance and supplemental security income benefits.  Nelson argues that the Administrative Law Judge ("ALJ") did not adequately explain the weight he gave to the opinions of two treating sources.  He also argues that the ALJ's decision was not supported by substantial evidence.  We agree that the ALJ did not explicitly state what weight he gave to the opinions of Drs. Lane Cook and Glenn Peterson.  We decline to reverse and remand, however, because the ALJ's analysis of Nelson's mental impairments adequately addressed the opinions of Drs. Cook and Peterson by indirectly attacking both the supportability of those opinions and the consistency of

---

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

those opinions with the record as a whole. We also find that substantial evidence supported the ALJ's denial of Nelson's application for benefits. We affirm the decision of the district court.

I

Nelson filed for supplemental security income ("SSI") benefits on December 15, 2001, and for disability income benefits ("DIB") on January 8, 2002. He alleged that he was disabled because of mental impairments, namely anxiety, lack of concentration, panic attacks, feelings of hopelessness, and nervousness around others. He alleged a disability onset date of August 15, 2001.

Nelson, born in 1975, finished 12th grade. From 1992 until September 2001, he worked variously as a dishwasher, mail handler, construction worker, garage door installer, sewer of backpacks, and retail store clerk. For two years ending in early 2002, Nelson studied computer science at Pellissippi State Tech Community College.

Nelson began treatment with Dr. Lane Cook, a psychiatrist, on March 1, 2001. Nelson complained of depression. Dr. Cook noted that Nelson reported depression, social anxiety, and sleep problems, with low energy and concentration. Nelson informed Dr. Cook of past drug use. Nelson was taking computer science classes at Pellissippi State. He played drums and listened to music.

Dr. Cook noted that Nelson's Liebowitz Social Anxiety score was "quite high at 121." Dr. Cook gave Nelson a GAF score of 52, with 57 as Nelson's highest score in a year. GAF is the Global Assessment of Functioning, and is on a scale of 0-100, with mental health highest at the high end; 50-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* Nelson Br. at A-25; *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 502 n.7 (6th Cir. 2006) (per curiam); *Martin v. Comm'r of Soc. Sec. Admin.*, 61 F. App'x 191, 193

and nn.2, 3 (6th Cir. 2003). Dr. Cook diagnosed Nelson with generalized social phobia, "major depressive disorder recurrent moderate chronic without full interepisode recovery," and attention deficit hyperactivity disorder ("ADHD"). Dr. Cook put Nelson on a variety of medications.

Subsequent entries in Dr. Cook's records during the spring and summer of 2001 deal mainly with adjustments to the medications, although he did note that Nelson's social anxiety had not decreased. Notes during mid-2001 indicate that Nelson felt less depressed and that he could focus better. In the fall of 2001, Dr. Cook noted that Nelson felt more stressed at work. Nelson eventually stopped work as a clerk at a record store.

In November 2001, Dr. Cook filled out a questionnaire for Nelson's Social Security claim. Dr. Cook entered marks on a form indicating that, regarding Nelson's mental ability to make work-related performance adjustments, Nelson had a fair ability to understand, remember, and carry out complex and detailed job instructions and a good ability to understand, remember, and carry out simple job instructions. Dr. Cook elaborated that Nelson had "[p]roblems with disorganization and poor attention to details. Anxiety worsens his attentional deficits." Regarding Nelson's mental ability to make occupational adjustments, Dr. Cook opined that Nelson had a fair ability to follow work rules and to function independently and maintain attention and concentration, but a poor or no ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, or deal with work stresses. Dr. Cook elaborated that Nelson "[r]ecently quit job over difficulty with social interactions, also dropped out of college. He has regressed significantly since entering treatment." Regarding Nelson's mental ability to make personal-social adjustments, Dr. Cook opined that Nelson had a good ability to maintain personal appearance, a fair ability to

demonstrate reliability, and a poor or no ability to behave in an emotionally stable manner or relate predictably in social situations. Dr. Cook elaborated that Nelson had "[e]xtreme social anxiety, problems interacting even on a limited superficial basis." Dr. Cook ceased treating Nelson in January 2002 when Nelson could no longer afford it.

Licensed social worker Melinda Triemstra reported in November 2001 that Nelson had extreme social phobia, major depression, and attention deficit disorder. Triemstra gave Nelson a GAF score of 21, indicating serious impairment or inability to function. She did not see him making progress in the near future. Thereafter, Triemstra, who saw Nelson for therapy sessions at least through mid-2002, continued to portray Nelson's condition in by far the bleakest light of any of the other professionals in the record. For example, in July 2002, Triemstra stated that Nelson "[p]retty much is . . . unable to do anything that involves concentrating," and in January 2004, apparently without having seen Nelson for some time, she submitted a report that stated that Nelson faced extreme or marked difficulties in a range of activities and capabilities.

On February 12, 2002, Pamela Branton, a licensed psychological examiner, examined Nelson as part of his disability determination and wrote a report also signed by Dr. Bruce Seidner, a psychologist. The report stated that Nelson loved listening to music, played drums occasionally, did housecleaning, did his own laundry, and drove on a daily basis. The report diagnosed Nelson with major depressive disorder, social phobia, and ADHD. It stated that Nelson's ability to understand directions was not significantly limited, that his recent memory was somewhat limited, and that Nelson "appears to be an extremely avoidant individual who is very uncomfortable around others. He would probably have significant difficulty maintaining appropriate interaction with the public,

co-workers, and supervisors. He probably would have a lot of difficulty handling criticism from supervisors and would most likely tend to withdraw." The report concluded that Nelson "would likely do better working alone or in a very supportive and reinforcing setting."

On February 22, 2002, Nelson was admitted to Lakeshore Mental Health Institute, where he stayed for a few days, following an episode in which his mother alleged that he had barricaded himself in his room with a gun and the police became involved. Nelson denied any intention to harm himself. The discharge report, written by Dr. Warren Rogers, diagnosed Nelson with ADHD by history, social anxiety disorder, cannabis abuse, and depressive disorder. It assigned Nelson a GAF score of 60. It noted that Nelson appeared slightly anxious at times but that he was oriented, and had intact memory, concentration, and attention. The report stated that Nelson's insight was fair and his judgment impaired. Nelson was discharged with prescriptions and instructions to avoid addictive substances.

In March 2002, Dr. James Walker reviewed the evidence for the state agency. Dr. Walker found Nelson was not significantly limited in most areas, with moderate limitations in the ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal work day/week without interruptions from psychological symptoms; interact appropriately with the public; accept instructions and respond to criticisms; and respond appropriately to changes in the work setting. Dr. Walker noted that Nelson could "perform detailed [tasks, presumably]," maintain a schedule with some lapses, work with the public at a low level, accept criticism with some difficulties, and adapt to low-level change. Dr. Walker diagnosed Nelson

with depressive syndrome, anxiety, and ADHD. Dr. Walker concluded that Nelson was moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace, and had no episodes of decompensation. He noted that Nelson had been misleading regarding his marijuana use, and that Nelson was avoidant but could be around the public, adding that he took college classes.

Nelson received treatment at Ridgeview Psychiatric Hospital on various occasions from December 2001 to 2003. Psychiatrist Dr. Ira Lew (so far as we can tell it was Dr. Lew) noted in December 2001 that Nelson had a GAF of 55 and appeared oriented with intact thought processes, memory, judgment, and insight, but with a suspicious attitude and depressed, anxious mood. Reports from April and May 2002 indicate that Nelson was depressed and anxious, and that he dropped out of school after the brief hospitalization, but also that his memory and concentration were good, and that he "reports doing well."

Dr. Frank Kupstas, who reviewed the evidence for the state in September 2002, found Nelson not significantly limited in most areas, with moderate limitations in the ability to: maintain attention and concentration for extended periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. Dr. Kupstas found that Nelson could maintain concentration over extended periods of time for simple tasks and for detailed tasks with some difficulty at times, and with some limitations had the ability to interact with people.

Nelson began treatment at Peninsula Behavioral Health in February 2003. A doctor (apparently Dr. Glenn Peterson) found him to have a GAF score of 50 that April. In October 2003, Nelson reported that he was not depressed or anxious. Nelson was exercising at home. He was still

isolating himself, but medicine was helping his anxiety. In November, he reported decreased concentration in the afternoon and anxiety. Both his sleep and appetite were "good."

On December 30, 2003, Dr. Peterson filled out a form on which he indicated that Nelson was moderately impaired in understanding and remembering simple instructions, making judgments on simple work-related decisions, and interacting appropriately with co-workers; that he was markedly impaired in carrying out short, simple instructions and responding to changes in a routine work setting; and that he was extremely impaired in understanding, remembering, and carrying out detailed instructions, in interacting appropriately with the public and with supervisors, and in responding to pressures in a usual work setting. In support of that assessment, Dr. Peterson stated that Nelson had "severe social anxiety" and "cannot relate to people."

Nelson's claim for benefits was denied initially and on reconsideration. He requested a hearing. After a hearing that included testimony from Nelson and a vocational expert (VE), Jo Ann Bullard, the ALJ issued an opinion denying Nelson's claims on April 15, 2004.

The ALJ discussed the evidence in the case over five and a half pages. After reviewing Triemstra's reports, the ALJ set out the governing standards as to the weight to be accorded treating-source medical opinions. He concluded that he would not give Triemstra's medical opinions considerable weight because Triemstra, as a social worker, did not meet the definition of an acceptable medical source.

The ALJ then discussed Dr. Cook's reports. While that discussion focused on Nelson's statements to Dr. Cook and the doctor's adjustments of Nelson's medications, it did not specifically address Dr. Cook's opinions regarding Nelson, as detailed above. After a review of the other

medical evidence, during which the ALJ emphasized, e.g., the entries in the records from Dr. Seidner and from Lakeshore (Dr. Rogers) and Ridgeview (Dr. Lew) that medication improved Nelson's condition and assigning Nelson GAF scores indicating only moderate symptoms, the ALJ briefly addressed the evidence from Dr. Peterson, noting that "Dr. Peterson opined that due to the claimant's severe social anxiety, he could not relate to people."

The ALJ found that Nelson passed steps 1 and 2 of the familiar five-step process for determining disability outlined at 20 C.F.R. §§ 404.1520 and 416.920, stating that Nelson had not worked since his alleged onset date and that he had anxiety, depression, poor concentration, panic attacks, and suicidal thoughts that were "severe" within the meaning of the regulations. At step 3, the ALJ evaluated Nelson's affective disorder, anxiety-related disorder, and personality disorder under listings 12.04, 12.06, and 12.08, respectively, in 20 C.F.R. Pt. 404, Subpt P, App. 1. The ALJ determined that Nelson's impairments did not meet or medically equal those listings. The ALJ found that Nelson had no limitations in the activities of daily living, mild-to-moderate limitation in social functioning, mild-to-moderate limitation in concentration, persistence, and pace, and that he experienced one or two episodes of decompensation. Those limitations did not meet the Part B criteria for the three relevant listings.

The ALJ moved on to determine Nelson's residual functional capacity (RFC) for steps 4 and 5. The ALJ noted, in summarizing Nelson's testimony from the hearing, that Nelson said he left his residence (he lived with a cousin) to see doctors and therapists and to go grocery shopping, tried to avoid his cousin, and had trouble concentrating even on television for more than a few minutes. The ALJ concluded that the record "does not support the claimant's testimony regarding the intensity

and persistence of his symptoms." The ALJ found Nelson "not totally credible" in his description

of his limitations.

The ALJ noted that the record showed that treatment had been "generally successful in

controlling [Nelson's] symptoms" (a conclusion supported by, e.g., his discussion of the records

from Dr. Seidner and from Lakeshore and Ridgeview), and cited Nelson's going to the store, doing

cleaning and making microwave dinners for himself, his having gone to college (ending in early

2002) and maintained a good grade point average when on a particular medication, records showing

his sleep and appetite as good and his energy level as okay, his playing drums and enjoying music

and the computer, his exercising, and recent medical office notes indicating no depression or

anxiety.

Referencing Medical-Vocational Guideline 204.00[1], the ALJ concluded that Nelson retains

the RFC to perform a wide range of work, "provided that he avoid complex or highly detailed work

and avoid frequent contact with the public." The ALJ based that determination on "the overall lack

of objective findings, the types of daily activities he performs and the fact that claimant did not

allege a physical impairment." The ALJ further supported that finding by stating that the

conclusions of the nonexamining state agency medical consultants (Drs. Walker and Kupstas) that

Nelson was only moderately limited in his ability to work were consistent with the findings of Dr.

---

[1]When claimants fall within the Medical-Vocational Guideline at 20 C.F.R. § 404, Subpt. P, App. 2, 204.00, they "retain the functional capacity to perform heavy work" and "ordinarily will not have a severe impairment or will be able to do their past work–either of which would have already provided a basis for a decision of 'not disabled.'" The ALJ, as discussed in the text below, ultimately concluded that Nelson was able to perform his past work as a kitchen helper, garage door assembler, material handler, forklift driver, and log truck driver.

Seidner. The ALJ did not give much weight to Triemstra because she was not a medical source. The ALJ did not discuss specifically what weight he gave Dr. Cook's or Dr. Peterson's opinions. Concluding that Nelson's "impairments preclude only complex or highly detailed work and frequent contact with the public," the ALJ determined that Nelson could return to his previous work–specifically as a kitchen helper, garage door assembler, material handler, forklift driver, and log truck driver, based on the testimony of the VE. Nelson thus failed step 4.

The Appeals Council denied Nelson's request for review, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. The district court affirmed the Commissioner's denial of benefits. The district court found that while the ALJ's opinion was not written as clearly as it could have been, the ALJ's rationale for rejecting the opinions of Drs. Cook and Peterson was nonetheless discernable; those opinions were not based on clinical and laboratory diagnostic techniques and were inconsistent with the record as a whole. *Nelson v. Barnhart*, No. 3:04-CV-346, slip op. at 8-10 (E.D. Tenn. Mar. 23, 2005), included as appendix in Nelson Br. at A-13-A-15 and in Comm'r Br. at A-19-A-21. In addressing the ALJ's finding that Nelson was not fully credible, the district court pointed out various inconsistencies in the record regarding Nelson's self-reporting of his drug use, and noted with dismay Nelson's statement in a request for reconsideration of the initial denial of benefits in 2002 that if he received the benefits, "I would be able to concentrate on school, graduate, and better my situation; therefore, help would no longer be needed." The district court commented that if Nelson is able to graduate and "better himself," he is able to work. The district court also pointed to testimony from Nelson at the hearing

that his trouble with supervisors at his most recent job was diminished if he did what he went to work to do.

## II

Nelson's appeal focuses on the ALJ's lack of explicit explanation regarding the weight given to the opinions of Drs. Cook and Peterson and social worker Trietsma. The Commissioner argues that the ALJ's opinion shows that those opinions were not supported by clinical or diagnostic findings and were inconsistent with the record, that the ALJ therefore by clear inference did not afford them much weight, and that the ALJ's opinion was supported by substantial evidence.

## A

"This court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (internal quotation marks and citation omitted). *See also* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 285, 286 (6th Cir. 1994). This court "must defer to an agency's decision even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (internal quotation marks and citation omitted). This court may not review the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

No. 05-5879
Nelson v. Comm'r of Soc. Sec.

We review de novo the district court's grant of summary judgment. *See Sharp v. Barnhart*, 152 F. App'x 503, 506 (6th Cir. 2005). Where, as here, the Commissioner adopts the ALJ's decision as the Commissioner's own, we review the ALJ's decision directly. *Ibid*.

B

Under 42 U.S.C. § 423(d)(2), a person is disabled under the Social Security Act if "his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work . . . ." The Commissioner follows the familiar five-step evaluation process for determining whether the claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920[2]; *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

The regulations specify a particular technique for evaluating the severity of mental impairments and, if the impairments are severe, for determining if they meet or equal in severity a listed mental disorder. 20 C.F.R. §§ 404.1520a, 416.920a. That technique centers on the ALJ's rating the claimant's degree of limitation in three functional areas (activities of daily living; social functioning; and concentration, persistence, and pace) and then enumerating episodes of decompensation. The degree of limitation in the functional areas is determined based on a five-point scale of none, mild, moderate, marked, and extreme. *Ibid*.; s*ee also* 20 C.F.R. § 404, Subpt. P, App. 1, 12.00.

The mental health listings that the ALJ used in this case are 12.04, affective mood disorders; 12.06, anxiety related disorders; and 12.08, personality disorders. The first two require parts A and

---

[2]The Commissioner's regulations governing the evaluation of disability for DIB are at 20 C.F.R. Part 404, and for SSI are at 20 C.F.R. 416. They are identical for purposes of this case. *See* Commissioner's Br. at 3 n.2.

B or A and C of the listings to be satisfied; the last only has A and B parts, both of which must be satisfied. In each case, part B of the listing requires that the condition (determined in Part A) result in "at least two of the following":

1. Marked restriction in activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining, concentration, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

The ALJ did not explicitly discuss the A part of each of the listings but stated that Nelson, based on the ratings the ALJ gave him in the three functional areas and the number of decompensations, did not meet the B part, nor did Nelson meet the C part of listing 12.04 and 12.06. The ALJ then went on to determine Nelson's RFC and, combining that with the VE evidence, determined that Nelson failed step 4.

The Commissioner's regulations discussing the evaluation of opinion evidence state that the Commissioner will evaluate every medical opinion and will consider the following factors in deciding what weight to give each opinion: examining relationship; treatment relationship; supportability; consistency; specialization; and other factors. 20 C.F.R. §§ 404.1527(d), 416.927(d). *See generally* 20 C.F.R. §§ 404.1527, 416.927. A treating source opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. If the treating source opinion is not given controlling weight, its weight is determined by the same factors that are considered in evaluating every medical opinion. The regulations specify that the Commissioner

"will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."[3] 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Recent opinions from this court reflect that the ALJ must provide good reasons for the weight given a treating source's opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456 (6th Cir. 2005). *Wilson* reversed and remanded a denial of benefits, even though "substantial evidence otherwise supports the decision of the Commissioner," because the ALJ failed to give good reasons for discounting the opinion of the claimant's treating physician. *Wilson*, 378 F.3d at 543-46. The *Wilson* court refused to decide whether a *de minimis* violation of the § 1527(d)(2) procedural requirement may qualify as harmless error, but noted instances it which it might: 1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of § 1527(d)(2)–the provision of the procedural safeguard of reasons–even though she has not complied with the terms of the regulation." *Id*. at 547.

In *Hall*, the court also reversed and remanded where the Commissioner had failed to provide good reasons for the weight given a treating source's opinion. 148 F. App'x at 457. *Hall* went some way to interpreting the third example provided by the *Wilson* court for when a violation of the

---

[3]That point is echoed in Social Security Ruling ("SSR") 96-2p, a policy interpretation entitled "Giving Controlling Weight to Treating Source Medical Opinions," which states that "the notice of the determination or decision," if unfavorable, "must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5.

requirement that the Commissioner give good reasons for the weight given a treating source opinion may amount to harmless error–i.e., that the Commissioner met the goal of that procedural protection, if not its letter. *Id*. at 462-67. In *Hall*, the ALJ had failed to explain the weight given to the opinions of a Dr. Caudill, a treating source who provided opinions on mental and physical impairments of the claimant. *Id*. at 458-59, 463. The *Hall* court interpreted the final example provided by the *Wilson* court of a harmless error–if the ALJ meets the goal of § 1527(d)(2)–as follows:

> As applied to this case, the ALJ could have met the goal of providing good reasons [for dismissing the medical opinion of Dr. Caudill regarding the claimant's back ailment] by either his analysis of Dr. Caudill's other opinions or his analysis of Hall's back problems in general. Such analyses would perhaps adequately address Dr. Caudill's opinion about Hall's back pain by indirectly attacking the "supportability" of the doctor's opinion, § 404.1527(d)(3), or the "consistency" of his opinion with the record as a whole, § 404.1527(d)(4), both of which are grounds for rejecting a treating source opinion, see § 404.1527(d)(2). However, it is critical that, when reviewing the ALJ's reasoning for this purpose, we remember the goals of the procedural safeguard. We are reviewing the . . . decision to see if it implicitly provides sufficient reasons for the rejection of Dr. Caudill's opinion regarding Hall's back, . . . not merely whether it indicates that the ALJ did reject Dr. Caudill's opinion.

*Id*. at 464.

Applying that analysis to this case, we find that the ALJ's evaluation of Nelson's mental impairments indirectly attacks both the supportability of Dr. Cook's and Dr. Peterson's opinions and the consistency of those opinions with the rest of the record evidence.

The parties agree that Drs. Cook and Peterson are treating sources. The Commissioner also concedes that Nelson's impairments are severe; the issues here focus on the ALJ's findings at steps 3-5, and the weight it gave to the opinions of Drs. Cook and Peterson in making those findings. The ALJ's references to the opinions of Drs. Cook and Peterson are brief, and provide no explicit

indication of the weight it gave either doctor's opinion regarding Nelson's limitations, as the ALJ was required to do.

However, the ALJ's discussion of the other record evidence about Nelson's mental impairments makes clear that the opinions of Drs. Cook and Peterson as to Nelson's limitations do not meet one of the two criteria for controlling weight: that the opinion be consistent with the other record evidence as a whole. Drs. Cook and Peterson found considerable limitations on Nelson's work abilities, as detailed above. The VE noted in her testimony that if Nelson were limited in the ways Drs. Cook and Peterson found, Nelson could not perform on a sustained basis any jobs that existed in significant number. Dr. Cook's and Dr. Peterson's opinions obviously conflict with the medical opinions of: 1) Drs. Walker and Kupstas, the nonexamining state agency doctors, who found few and only moderate limitations resulting from Nelson's mental impairments; 2) Dr. Rogers, who wrote the discharge report from Nelson's stay at Lakeshore, who found that Nelson had a GAF of 60 and intact memory, concentration, and attention, and fair insight; 3) Dr. Seidner, who determined that Nelson could work alone or in a very reinforcing setting; and 4) Dr. Lew, who assigned Nelson a GAF of 55 and noted that Nelson had intact thought processes, memory, judgment, and insight. In his opinion, the ALJ specifically discussed the findings of Drs. Walker, Kupstas, and Seidner, and the Lakeshore discharge report, which was written by Dr. Rogers. Furthermore, the ALJ explicitly stated that the opinions of Drs. Walker, Kupstas, and Seidner were consistent, thereby further attacking, albeit indirectly, the opinions of Drs. Cook and Peterson. We think it clear that the ALJ's discussion of the record evidence shows that the ALJ found the opinions of Drs. Cook and Peterson to be inconsistent with the other record evidence. This case thus stands

in stark contrast to *Hall*, where the court's review of the ALJ's discussion of Hall's back problems turned up *no reason* for the ALJ's rejection of Dr. Caudill's opinion on that subject. 148 F. App'x at 465-66. In *Hall*, none of the opinions of the various doctors as to the claimant's back pain recommended the RFC ultimately adopted by the ALJ; in determining the claimant's RFC, the ALJ did not "compare *any* of the medical evidence about Hall's back problem"; and the ALJ's conclusion did not reveal the reasons for dismissing Dr. Caudill's opinion. *Id.* at 466.

Furthermore, in addition to indirectly attacking the consistency of Dr. Cook's and Dr. Peterson's opinions with the rest of the record evidence, in this case the ALJ stated that "there are no clinical and diagnostic findings to establish [that Nelson] has conditions that would significantly compromise" his RFC. That passage, although it does not directly address the medical opinions of Drs. Cook and Peterson, is an indirect attack on the supportability of those opinions. And indeed, Dr. Cook's and Dr. Peterson's opinions are not well-supported nor explained by medical signs and laboratory findings. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

For example, Dr. Cook, who treated Nelson from March 1, 2001, to approximately January 2002, assigned Nelson a GAF of 52, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. Over the course of his treatment with Dr. Cook, Nelson reported doing better at various times as a result of the medications. Yet on the form that Dr. Cook filled out for Nelson's Social Security claim, Dr. Cook opined that Nelson had a poor or no ability to, e.g., interact with supervisors or function independently. That opinion seems incompatible with the GAF score Dr. Cook assigned Nelson and the improvement generated by prescription medications.

Dr. Peterson, who treated Nelson in 2003, gave Nelson a GAF of 50, again indicating moderate symptoms or moderate limitations. Nelson at one point told Dr. Peterson that he was not depressed or anxious, although he later reported some decreased concentration in the afternoon and some anxiety. On December 30, 2003, however, Dr. Peterson indicated on a form that Nelson was markedly impaired in, e.g., carrying out short, simple instructions, and extremely impaired in, e.g., responding to pressures in a usual work setting. Dr. Peterson provided little or no elaboration on those opinions, and the treatment records do not show that those opinions are supported by medically acceptable clinical and laboratory diagnostic techniques. Numerous other doctors who had assigned Nelson similar GAF scores had not found Nelson to be so impaired.

We find that the ALJ's analysis of Nelson's mental problems adequately addressed Dr. Cook's and Dr. Peterson's opinions by indirectly attacking both the consistency of those opinions with the other record evidence and their supportability. The ALJ implicitly provided sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little or no weight overall. The ALJ thus "met the goal of § 1527(d)(2)–the provision of the procedural safeguard of reasons–even though she has not complied with the terms of the regulation." *Hall*, 148 F. App'x at 462 (internal quotation marks omitted) (quoting *Wilson*, 378 F.3d at 547). We take the opportunity to note, however, that this is a rare case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter. The Commissioner's own regulations and our case law state that the Commissioner must provide good reasons for rejecting the medical opinion of a treating source. That rule is a "procedural protection," see *Wilson*, 378 F.3d at 546, and a way of ensuring "meaningful review" of the ALJ's decision, see *id.* at 544.

We note briefly that Nelson complains of the weight given to the opinions of Triemstra, the social worker. In the ALJ's view, Triemstra's opinions did not merit considerable weight in determining Nelson's RFC. As discussed above, the ALJ explicitly stated that Triemstra was not an acceptable medical source under the regulations, a statement that Nelson does not contest. Moreover, the ALJ's analysis of Triemstra's statements and the rest of the record evidence make clear that Triemstra's statements were incompatible with the other evidence, including even the opinions of Drs. Cook and Peterson.

Nelson complains about the hypothetical question posed by the ALJ to the VE, which posited limitations on Nelson that were less severe than those found by Drs. Cook and Peterson, but that is essentially no more than a different way of challenging the weight given to the opinions of Drs. Cook and Peterson, which we have already analyzed in detail.

Finally, the ALJ's opinion is supported by substantial evidence, e.g., the assessments by Drs. Walker, Kupstas, Rogers, and Seidner. The ALJ reasonably found Nelson's credibility as to his limitations to be less than complete.

## III

For the foregoing reasons, we AFFIRM the decision of the district court.