**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0264n.06

**No. 09-3889**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Apr 28, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| STEVEN J. FRIEND, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Northern |
| COMMISSIONER OF SOCIAL SECURITY, | ) | District of Ohio |
| | ) | |
| Defendant-Appellee. | ) | |

Before:       BOGGS, SUHRHEINRICH, and WHITE, Circuit Judges.

PER CURIAM.  Steven J. Friend ("Friend") appeals from the district court's judgment affirming the decision of the Commissioner of Social Security ("Commissioner") denying Friend's applications for disability insurance benefits and supplemental security income.  He argues that the Administrative Law Judge ("ALJ") that heard his case erred in determining his "residual functional capacity" ("RFC") as required by Social Security regulations; this error, Friend claims, arises from the ALJ's unwarranted rejection of the conclusions of Friend's treating physicians, and from the ALJ's failure to take into account relevant restrictions on Friend's mental capacities.  Because the ALJ failed to provide good reasons for rejecting the opinions of Friend's treating physicians, we remand.

**I**

Friend, born in 1962, is a former factory laborer, inspector, and janitor with a grade-school education who resided, at all times material to this case, in Wooster, Ohio. He last worked for a pallet-manufacturing company; beginning as an inspector, his job entailed ensuring that pallets were constructed properly. On occasion, he was required to lift 75 to 80 lbs. At some point during his employment with that company, Friend injured his shoulder, requiring surgery and a reassignment to the less-physically-demanding job of janitor. He continued his employment as a janitor until the plant at which he worked closed, allegedly near the end of 2002.

Friend filed claims for disability insurance benefits and supplemental security income on April 22, 2005, alleging that, as of November 30, 2002, he had become unable to work because of a heart problem, impingement syndrome affecting his right shoulder, depression, and illiteracy. According to his application, these conditions had first bothered Friend on November 24, 2001. Among the physicians treating Friend for his conditions were Dr. Dale Angerman, a general practitioner, and Dr. Kenneth Shafer, a cardiologist.

On October 29, 2002, Friend saw Dr. Angerman for a follow-up visit after having been admitted to the hospital for observation five days earlier due to complaints of an irregular heartbeat. Dr. Angerman's notes show that, during Friend's hospital observation, he had an EKG, blood work, and a chest x-ray; the EKG and blood work were normal, and the x-ray showed some scarring at the top of his right lung. Though Friend told Dr. Angerman that he was experiencing intermittent dizziness, the doctor's objective findings indicated that Friend's "[h]eart show[ed] a regular rhythm without murmurs or gallops." Dr. Angerman assessed Friend as experiencing palpitations,

depression, and chest pain, and his notes indicate that he would refer friend for a stress test in order to further evaluate Friend's condition.

On November 7, 2002, Friend underwent the stress test recommended by Dr. Angerman at Wooster Community Hospital. The results of the stress test were evaluated by cardiologist Dr. Kenneth Shafer, who noted that the test "was remarkable for nonsustained ventricular tachycardia in recovery." Dr. Shafer's notes disclose that Friend had been admitted for observation and further evaluation of his ventricular tachycardia, including heart catheterization. According to Dr. Shafer, the catheterization would help diagnose any cardiomyopathy (disease of the heart muscle) and/or ischemia (decreased flow of blood, generally due to a blockage in a blood vessel) that might be responsible for the exercise-induced tachycardia.

The catheterization was performed the next day by Dr. Shafer. In the subsequent report detailing his findings, Dr. Shafer found Friend's left ventricular function to be moderately depressed, with an ejection fraction (the portion of blood pumped out of the ventricles with each heartbeat) of 45%. His overall impression was as follows:

> Mr. Friend presents with nonsustained ventricular tachycardia, syncope and an abnormal stress [test]. The [stress test] was a false positive. He has no significant fixed coronary disease. There is a moderate cardiomyopathy with elevation of left ventricular end diastolic pressure. Right ventricular end diastolic pressure was normal. The ventricular tachycardia may be related to his cardiomyopathy or may be independently due to a different mechanism.

Dr. Shafer further advised Friend that he was "at risk of sudden cardiac death and further episodes of syncope and that he [was] placing himself and others in jeopardy if he fails to follow up with treatment." In his discharge summary, Dr. Shafer further opined that "[b]ecause of the normal

coronaries it is obvious that his ventricular tachycardia is not on an ischemic basis. . . . He has normal right ventricular function on an echo but his left ventricular systolic function is depressed to around 40%. He may have a low grade cardiomyopathy of another etiology."

Friend saw Dr. Shafer again on February 25, 2003, in order to obtain the cardiologist's clearance to have shoulder surgery. Though Friend's heart condition was not the reason for this visit, Dr. Shafer's notes indicated that he did review the history of that condition with Friend, and advised that there were still "unanswered questions regarding the nature of his ventricular arrhythmia and its relation to stress." Specifically, Dr. Shafer told Friend that "[i]t may be an innocent rhythm . . . or it may be that it is related to a cardiomyopathy and that he is still at risk. These questions can only be answered with a followup cardiac echo and an [electrophysiology] study."

Dr. Shafer subsequently authorized an electrophysiology study as "medically necessary" to determine whether Shafer's heart condition would prevent him from receiving anesthesia during his shoulder surgery. That study, performed by cardiologist Gregory Bonavita on June 13, 2003, demonstrated "[i]nducible polymorphic ventricular tachycardia," which was "likely on the basis of the patient's prior cardiomyopathy." Dr. Bonavita noted that Friend would receive an internal cardiac defibrillator (a pacemaker) "due to the presence of cardiomyopathy which can increase his risk for sudden arrhythmic death from other types of [ventricular tachycardia], not yet identified." The defibrillator was implanted on the same day as the electrophysiology study, June 13, 2003. Dr. Shafer saw Friend for follow-up on June 16, 2003, at which time it was noted that Friend was experiencing unremarkable levels of postoperative swelling and irritation; the doctor noted that he would see Friend for follow-up in about four months.

The next indication in the record of treatment by Dr. Shafer is a follow-up office visit dated May 26, 2005, and the doctor's notes on that occasion indicated that Friend had returned for his first visit in two years. An echocardiogram was recommended. A subsequent echocardiography final report dated May 30, 2005, noted that Friend had a normal left ventricle size with moderate global systolic dysfunction and Stage I diastolic dysfunction.

Friend then underwent another stress test on June 21, 2005, which found his peak heart rate to be 164% of the predicted maximum and his left ventricular ejection fraction to be 49%, along with myocardial thickening; the examining physician indicated that he could not, from the results of the test, rule out myocardial ischemia. On June 29, 2005, Dr. Shafer noted that "[A] stress test since the last visit . . . was abnormal, suggesting inferior ischemia. This was discussed with [Friend], and I have suggested to him that this is probably a false-positive test."

Friend had another office visit with Dr. Shafer on September 21, 2005, when he complained of dizziness, but no cardiac abnormalities were noted. On March 21, 2006, he saw Dr. Shafer for a check-up, at which time he appears to have improved; the doctor's notes indicated that "[o]verall, his exercise tolerance has improved. He denies any chest discomfort. He has had no defibrillations. . . . He denies any palpitations, TIAs, amaurosis, claudication."

On August 30, 2006, Friend saw Dr. Shafer and reported that he had been having chest pains; he also requested a letter of support for his disability application. According to Dr. Shafer's notes, Friend had been having problems with intense left inframammary pain, and had also been continuing to have a sensation of palpitations. On examination, Dr. Shafer found no cardiac abnormalities, but

the doctor noted that a recent echocardiogram had demonstrated Friend's ejection fraction to be

moderately depressed at 40%. Dr. Shafer concluded that

> It is likely that his chest pain is related to some pleural pericarditis or possibly to his cardiomyopathy. His stress test was abnormal, suggesting inferolateral ischemia, but previous stress test several years ago was a false positive, and he was found to have no evidence of significant coronary disease. He does, however, have a cardiomyopathy with exercise-induced ventricular arrhythmias and vigorous exercise program is contraindicated.

On the same day, Dr. Shafer wrote a letter "to whom it may concern" setting forth the basis for his

belief that Friend was disabled, noting that Friend was under his care "for multiple cardiac problems

including nonischemic cardiomyopathy, exercise-induced ventricular tachycardia associated with

syncope requiring implantable cardioverter defibrillator, and chronic chest pain syndrome." Shafer

opined that, in totality, these problems significantly limited Friend's activity. The limitation was felt

to be permanent.

On September 1, 2006, Friend saw Dr. Angerman, apparently for the first time since 2002,

when he underwent an examination for the purpose of obtaining a disability evaluation. At that time,

the doctor's notes described Friend as "[d]isabled because of heart disease," with a poor tolerance

for exercise. Friend's cardiac ejection fraction was 40%. His own physical examination of Friend

found his heart to be negative for abnormalities. Nevertheless, the doctor diagnosed Friend as

having cardiomyopathy and ventricular tachycardia. On a disability evaluation form provided by the

Ohio Department of Job and Family Services, Dr. Angerman repeated his diagnoses of

cardiomyopathy and exercise-induced ventricular tachycardia, along with chronic chest pain, and

noted that a defibrillator had been implanted in Friend in 2003. In a section of the form entitled

"Physical Functional Capacity Assessment," Dr. Angerman indicated that he believed Friend could stand or walk one hour per eight-hour work day.

On September 13, 2006, Dr. Shafer filled out a "Cardiac Residual Functional Capacity Questionnaire" on Friend's behalf, indicating that his diagnosis was "Cardiomyopathy - Class III." Friend's symptoms, according to Dr. Shafer, included chest pain, shortness of breath, fatigue, weakness, palpitations, and dizziness. In response to a question asking to what degree Friend could tolerate work stress, Dr. Shafer responded that Friend was incapable of even low stress jobs, and that his prognosis was "poor for meaningful improvement." However, in response to a section of the questionnaire asking him to estimate Friend's functional limitations if he were placed in a competitive work situation, Dr. Shafer merely wrote "not assessed." Dr. Shafer then gave substantially the same answers in a second RFC questionnaire dated February 20, 2007, again declining to give a specific assessment of Friend's functional limitations in a competitive work situation.

In addition to his consultations with Drs. Angerman and Shafer, Friend also saw psychologist Dr. Curt Ickes. On June 13, 2005, he was referred to Dr. Ickes for a clinical interview in order to determine his eligibility for disability benefits. On that occasion, Friend reported that he had medical concerns relating to a shoulder condition and severe arrhythmia, and had recently experienced symptoms of depression due to the fact that his mother was ill. Dr. Ickes found Friend's thought productivity to be in the average range, but noted that his social reasoning was poor and his memory well below average. Dr. Ickes estimated Friend's overall intellectual functioning to be within the "Borderline" classification. In relevant part, Dr. Ickes concluded that Friend's ability to maintain

attention, concentration, persistence, and pace to perform simple repetitive tasks would likely be moderately impaired in a work setting.[1]

Friend's disability hearing was conducted on March 26, 2007. During that hearing, the ALJ heard from medical expert Dr. Jonathan Nusbaum, who noted Friend's palpitations, his false-positive stress test, his pacemaker, and the limited ejection fraction demonstrated by echocardiograms, but did not mention or discuss the cardiomyopathy Dr. Shafer had diagnosed on several occasions. Dr. Nusbaum concluded that the record showed Friend to have "some sort of defect," and that Friend would be limited to lifting 20 lbs. occasionally and 10 lbs. frequently, with no limitation to sitting, and could stand and/or walk for an hour at a time six times per eight-hour work day.[2]

The ALJ then examined a vocational expert, Dr. Richard Oestreich. The ALJ asked Dr. Oestreich to consider a hypothetical person with the physical limitations suggested by Dr. Nusbaum and additional mental restrictions limiting him to simple, one- to two-step instructions and simple repetitive work that was not fast-paced and had only occasional changes to the work environment. Dr. Oestreich testified that such a person could not perform Friend's past employment, because that employment had required a medium level of physical exertion. However, Dr. Oestreich went on to testify that such person *could* perform other jobs available in the Wooster area, particularly as a hand

---

[1]Friend had previously seen Dr. Ickes on June 20, 2003, also on referral for his disability claim. Dr. Ickes's assessment on that occasion was very similar to that performed in 2005; if anything, the later evaluation is somewhat more positive with respect to Friend's work abilities, in that the 2003 evaluation described limitations not present in the 2005 report concerning Friend's ability to relate well with others.

[2]Dr. Nusbaum was also examined by Friend's attorney, but that line of questioning also did not touch on the cardiomyopathy diagnosis.

packer, inspector, or food service worker. On cross-examination, Dr. Oestreich was asked to what extent his assessment would be changed if he were to assume the limitation postulated by Dr. Angerman of standing or walking one hour in an eight-hour day; Dr. Oestreich testified that such mobility was "probably not enough to do any work."

The ALJ issued his decision denying Friend's application on June 22, 2007. In relevant part, the ALJ found that Friend had the ability to lift up to 10 lbs. both frequently and occasionally, and that he could stand or walk for one hour at a time to a total of six hours in a work day. The ALJ further found that Friend could follow simple one- and two-step instructions and could perform simple, repetitive work; while Friend could not perform fast-paced jobs, he could do work requiring no more than occasional significant changes in the work environment.

Although the ALJ adopted some of Friend's treating physicians' opinions as to Friend's ability to work, he rejected the opinion of Dr. Angerman that Friend could only stand and walk for one hour in an eight hour workday, explaining that Dr. Nusbaum's testimony that Friend could stand or walk for six hours in a workday was "more consistent with the objective clinical findings."

Similarly, the ALJ rejected the opinion of Dr. Shafer:

Turning to the documentary evidence provided from the claimant's treating cardiologist, a stress test was performed which was denominated a false positive by the cardiologist. However, even after so characterizing the results of that stress test, the same cardiologist proceeds to opine that the claimant is "incapable of even 'low stress' jobs,["] by checking the appropriate box on the representative provided forms . . . . Further, in his treatment notes . . . Dr. Shafer again states that the stress test results were likely a false positive and the claimant does not therefore have severe inferolateral ischemia. However, he again makes what now seems to be an unsubstantiated statement that the claimant would be unable to work given the combination of his cardiac problems, noting that his finding would support the claimant's application for disability. In view of Dr. Shafer's negation of the results

of the stress test, his statements regarding the ability to work due to those negated problems does [sic] not follow.

Given his findings as to Friend's ability to perform job-related duties, the ALJ further concluded, based on the testimony of the vocational expert, that Friend was capable of making a successful adjustment to other work, and that a finding of "not disabled" was therefore appropriate.

Friend submitted a request for review of the ALJ's decision to the Social Security Administration's Appeals Council. As a part of his appeal, Friend submitted the record of a visit to Dr. Shafer dated July 3, 2007, in which the doctor responded to the ALJ's mention of an apparent contradiction between the "false positive" nature of the stress test and the doctor's conclusion that Friend was incapable of maintaining employment. Specifically, Dr. Shafer noted that

> Steven's left ventricular function is impaired with ejection fraction of 40%. He has ventricular arrhythmias with syncope requiring beta-blocker therapy. I am still of the opinion that he is incapable of maintaining a job at this time due to these factors. This statement is in no way contradictory to my suggestion that his stress test was a false-positive. The latter statement goes only to the probable absence of significant obstructive coronary artery disease and in no way bears on his left ventricular impairment.

The Appeals Council denied Friend's request for review on September 14, 2007. With respect to the ALJ's rejection of Dr. Shafer's opinion, the Appeals Council specifically recognized that the ALJ had misinterpreted Dr. Shafer's statements. However, it noted that even if the basis for the doctor's opinion had been Friend's limited left ventricular function, the evidence showed that he had a left ventricular ejection fraction of 45%, which did not "meet or equal the requirements of any of the Cardiovascular Listings in the Listing of Impairments in Appendix I, Subpart P, Regulations No. 4."

Friend appealed to the district court. In an opinion and order dated May 18, 2009, Magistrate Judge Baughman[3] affirmed the decision of the Commissioner denying Friend disability insurance benefits and supplemental security income, holding that Dr. Shafer's opinion was not entitled to "controlling weight" under Social Security regulations because of his refusal in the two RFC questionnaires to opine regarding Friend's work-related limitations. The magistrate also held that the ALJ did not err in refusing to give Dr. Angerman's opinion that Friend could not stand more than one hour in an eight-hour day controlling weight, because there were no notations specifically supporting that limitation in the record.

This timely appeal followed.

## II

We review district court decisions in cases involving Social Security Disability determinations de novo. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Our review of the underlying decision of the Commissioner, however, is limited to determining whether that decision was (1) made pursuant to proper legal standards, and (2) supported by substantial evidence. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Where, as here, the Appeals Council denies review, the decision of the ALJ becomes the final decision of the Commissioner. *Osburn v. Apfel*, 182 F.3d 918 (table), 1999 WL 503528, at *4 (6th Cir. 1999). Accordingly, "we may only review evidence that was available to the ALJ to determine whether substantial evidence supported her decision." *Ibid.*

---

[3]The district court action was originally assigned to District Judge Solomon Oliver Jr. on September 12, 2007; the parties consented to magistrate judge jurisdiction on December 13, 2007.

As a preliminary matter, we note that the ALJ's decision was made pursuant to proper legal standards, and Friend does not argue otherwise. Rather, Friend contests the ALJ's decisions with respect to (1) the weight he accorded the evidence provided by Friend's treating physicians, and (2) the extent of Friend's mental abilities. Each of these decisions affected the determination of Friend's RFC, which the relevant regulations require an ALJ to apply in determining whether a disability applicant is capable of performing his past relevant work or making an adjustment to any other work. *See* 20 C.F.R. §§ 404.1502(e)–(g). Thus we review the portions of the ALJ's decision challenged by Friend to determine whether they are supported by "substantial evidence."

### III

### A

In assessing the medical evidence supporting a claim for disability benefits, the ALJ is bound by the so-called "treating physician rule," which generally requires the ALJ to give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians. *Blakley v. Comm'r*, 581 F.3d 399, 406 (6th Cir. 2009). The rationale behind the rule is that treating physicians

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). The ALJ must give a treating source opinion "controlling weight" if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Ibid.* Even if the ALJ does not give controlling weight to a treating physician's opinion,

he must still consider how much weight to give it; in doing so, the ALJ must take into account the length of the treatment relationship, frequency of examination, the extent of the physician's knowledge of the impairment(s), the amount of relevant evidence supporting the physician's opinion, the extent to which the opinion is consistent with the record as a whole, whether or not the physician is a specialist, and any other relevant factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)–(6).

The ALJ's decision as to how much weight to accord a medical opinion must be accompanied by "good reasons" that are "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5. This procedural "good reason" rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case. *Rogers*, 486 F.3d at 242.

We will reverse and remand a denial of benefits, even though "substantial evidence otherwise supports the decision of the Commissioner," when the ALJ fails to give good reasons for discounting the opinion of the claimant's treating physician. *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 543–46 (6th Cir. 2004). A failure to follow the procedural requirement "of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243; *see also Wilson* at 546 (a reviewing court "cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record of the ALJ to discount the treating source's opinion and,

thus, a different outcome on remand is unlikely"). Thus while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be "sufficiently specific" to meet the goals of the "good reason" rule.

Significantly, *Wilson* also observed that, in some circumstances, a violation of the rule might be "harmless error" if (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Id.* at 547. In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470–72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006). Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.

Applying that analysis to this case, we nevertheless find that the ALJ committed error with respect to his treatment of the opinion of Dr. Angerman. The ALJ's rationale for discounting that opinion was expressed simply as "the testimony of Dr. Nusbaum, which would allow the claimant

to stand/walk for one hour [at a] time to a total of six hours in an eight hour workday, is more consistent with the objective clinical findings," and "there is no basis for Dr. Angerman's conclusion that the claimant can stand/walk for only one hour in a day." This is not "sufficiently specific" to meet the requirements of the rule on its face, inasmuch as it neither identifies the "objective clinical findings" at issue nor discusses their inconsistency with Dr. Angerman's opinion. Moreover, we note that even when an ALJ *correctly* reaches a determination that a treating source's medical opinion is inconsistent with the other substantial evidence in the record, such a determination "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley*, 581 F.3d at 408 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4). Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. § 404.1527 and 416.927. *Id.* Put simply, it is not enough to dismiss a treating physician's opinion as "incompatible" with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.

Nor is this a matter of "harmless error." We find nothing in Dr. Angerman's opinions to be "patently deficient," and obviously the ALJ did not adopt his opinion with respect to the matter at issue. Moreover, this is not a situation in which the ALJ's discussion of other opinions, or of the claimant's physical problems, makes clear the basis on which the treating physician's opinion was rejected. Unlike, for example, the situation in *Nelson*, in which the ALJ specifically discussed the findings of several medical providers who had come to a different conclusion than the claimant's treating physician, *see Nelson*, 195 F. App'x at 471, the ALJ in this case discussed no opinions

contrary to that of Dr. Angerman other than that of the reviewing physician who testified at the disability hearing, and even that opinion was considered in only the most conclusory of terms. "We are reviewing the . . . decision to see if it implicitly provides sufficient reasons for the rejection of [the treating physician's] opinion . . . not merely whether it indicates that the ALJ did reject [that] opinion." *Hall*, 148 F. App'x at 464.

We find further error in the ALJ's failure to address the actual rationale for the conclusions of Dr. Shafer, Friend's cardiologist. Although we are not permitted to consider the July 3, 2007 clinical note explaining the supposed discrepancy between Friend's "false positive" stress test and Dr. Shafer's assessment of his physical capabilities, a review of the other materials in the record discloses sufficient evidence from which the relevant distinction should have been made. A careful reading of Dr. Shafer's notes reveals that the physical symptom of greatest concern to the doctor was consistently Friend's ventricular tachycardia. While the heart catheterization Dr. Shafer performed in November 2002 ruled out ischemia as a *cause* of that ventricular tachycardia—thus leading to the doctor's characterization of stress tests that were suggestive of ischemia as "false positives"—his further observation that "[t]he ventricular tachycardia may be related to his cardiomyopathy or may be independently due to a different mechanism" and his contemporaneous warning that Friend was at risk of death makes plain that, regardless of etiology, the underlying symptoms remained of concern.

Dr. Shafer's subsequent records confirm this line of analysis. His February 2003 note that the tachycardia "may be an innocent rhythm . . . or it may be that it is related to a cardiomyopathy and that he is still at risk," and his August 2006 letter in support of Friend's initial disability

application advising that he was treating Friend "for multiple cardiac problems including *nonischemic* cardiomyopathy, exercise-induced ventricular tachycardia associated with syncope requiring implantable cardioverter defibrillator, and chronic chest pain syndrome" (emphasis added) make clear that his assessment was not based upon a belief that Friend suffered from ischemia, but rather upon a diagnosis that included a complex of heart conditions.

In his opinion rejecting Friend's application, the ALJ characterized Dr. Shafer's opinions as unsupported in view of the fact that Friend's abnormal stress test had been a false positive. Because the ALJ misconstrued the relationship of that stress test to the conditions the doctor was discussing, however, the ALJ's implied conclusion that the doctor's opinions deserved little or no weight is not supported by substantial evidence. Whether Dr. Shafer's *actual* rationale is deserving of any particular weight is not now a matter for this court; though the Commissioner presents various arguments to the effect that record evidence not relied on by the ALJ would also justify discounting Dr. Shafer's conclusions, the same procedural protections that require remand for clarification of the ALJ's rejection of Dr. Angerman's conclusions apply with respect to an evaluation of those set forth by Dr. Shafer.

B

In addition to his arguments concerning the ALJ's findings as to his physical condition, Friend also argues that the RFC utilized to determine whether he could adjust to other jobs was flawed in that it did not take into account his mental capacities. On this point, we cannot agree.

Significantly, Friend does not contest the ALJ's decision to base his findings as to Friend's mental capacities on Dr. Ickes's reports; instead, Friend argues that the specific limitations adopted

by the ALJ are not supported by those reports. Friend maintains that Dr. Ickes found Friend to be *moderately* limited in his ability to perform simple, repetitive tasks and in his ability to withstand the stresses and pressures of work activity, a finding inconsistent with the ALJ's determination that (in Friend's words) "Friend could perform simple, repetitive work—without qualification . . . ."

The RFC determined by the ALJ, however, was decidedly *not* "without qualification" when it came to Friend's ability to perform simple, repetitive work. Read in conjunction with the other limitations the ALJ found to exist, the RFC limited Friend to only those jobs that entailed simple, repetitive work that required one- or two-step instructions; that were not fast-paced; and that required no more than occasional significant changes in his work environment. These qualifications appear to address directly the reasons set forth by Dr. Ickes for his belief that Friend would be moderately impaired in his capacity to perform simple, repetitive work, which included impairments to his ability to "maintain attention, concentration, persistence and pace." The ALJ adopted Dr. Ickes's findings that Friend's mental conditions would interfere to some extent with attributes associated with simple repetitive tasks, and built into the hypothetical he posed to the testifying vocational expert limitations that would ameliorate that interference. Because the use of those limitations "accurately portray[ed]" Friend's condition, the testimony of the vocational expert in response to that hypothetical provides substantial evidence to support the ALJ's subsequent RFC determination, at least with respect to Friend's mental limitations.

**IV**

For the above reasons, the judgment of the district court is **VACATED**, and the case

**REMANDED** with instructions that it be returned to the Commissioner for further proceedings

consistent with this opinion.