File Name: 09a0111n.06

Filed: February 10, 2009

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 08-5654**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **BYRON HASH**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| **COMMISSIONER OF SOCIAL SECURITY**, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellee*. | ) | |

**BEFORE:**    **MERRITT, COLE, and SUTTON, Circuit Judges.**

**COLE, Circuit Judge.** Claimant-Appellant Byron Hash appeals the district court's Opinion

and Order adopting the magistrate judge's Report and Recommendation ("R&R") affirming the

denial of his application for Disability Insurance Benefits ("DIB") under 42 U.S.C. § 405(g) by

Defendant-Appellee Commissioner of Social Security ("Commissioner"). Hash contends that the

district court's decision was improper because the findings by the Administrative Law Judge ("ALJ")

as to Hash's physical and mental limitations are not supported by substantial evidence. Hash also

argues that the district court incorrectly adopted the ALJ's determination that Hash's subjective

complaints were not credible. For the following reasons, we **AFFIRM** the district court's judgment

dismissing Hash's claim.

## I. BACKGROUND

A.        **Factual Background**

Hash is a fifty-five-year-old high school graduate with no additional schooling or job training who alleges that his back injuries, in combination with his depression, constitute disabilities entitling him to collect DIB. Hash worked as a pattern operator for Fruit of the Loom from 1978 through 1998 and as a welder for Midwest Stamping from 1998 through 2002. In April 2002, Hash injured his back lifting parts weighing between thirty and forty pounds that are used in the production of pick-up trucks. As a result, he could no longer perform the normal lifting and bending required for his position, and he remained off work for two months. He saw Dr. Daniel Hunt, an orthopedist, who diagnosed him with musculoskeletal back strain and recommended that he return to work on restricted duty.

Although Hash was initially able to perform light-duty work upon his return to work, the requirements for his position changed in October 2002, and he had to bend continuously while lifting three to four pound weights. Hash's back pain became intolerable, and he returned to Dr. Hunt, who recommended that Hash continue working on restricted duty.

After his follow-up appointment, however, Hash's pain continued to increase and began to radiate down his leg until it became intolerable. As a result, Hash quit his job on October 28, 2002. In November 2002, Hash received three lumbar epidural injections, but they provided him with only minimal relief. On November 25, 2002, Hash was referred to a neurosurgeon, Dr. John Johnson, and it was recommended that he refrain from any work pending the results of the neurosurgical examination.

Hash alleges that he first became "disabled" on August 22, 2003 (the date of his fiftieth birthday). From the occurrence of his 2002 injury through the present, the following doctors and therapists have treated him for his back pain: Drs. Daniel Hunt, John Johnson, Chris R. Koford, Arul Verghis, Mark Vollenweider, and occupational therapists at Frazier Rehabilitation Institute. Hash was also treated by the following individuals for his depression: Dr. Lew Hortoillosa, and various therapists at the Louisville, Kentucky-based Adanta Clinic ("Adanta"), Dr. Wayne R. Edwards, and Stephen Scher, Ph.D. and Lisa Perritt, Ph.D.

**B.        Procedural History**

On August 20, 2003, Hash filed his application for DIB. The Commissioner denied his claim initially and on reconsideration, and Hash timely filed a request for a hearing. On May 4, 2005, Hash appeared and testified before ALJ Roger Reynolds. The Commissioner called a vocational consultant and rehabilitation counselor to testify as to what jobs, if any, Hash could perform. The consultant opined that, given Hash's restrictions, he could still perform numerous bench assembly "types of jobs"—8900 in Kentucky and almost 393,200 in the national economy. He then clarified that there were approximately 5800 light-exertion level jobs with a sit-stand option available in Kentucky and approximately 346,400 such jobs existing in the national economy.

On October 6, 2005, after reviewing the relevant evidence, the ALJ concluded that Hash had failed to refute the Commissioner's showing that a significant number of jobs existed in the national economy, which Hash could perform, making him unqualified for DIB. The ALJ determined that Hash retained the residual functional capacity ("RFC") to perform a range of "light work" with the following restrictions:

> sit-stand option at one-hour intervals, no climbing of ropes, ladders or scaffolds; no work at heights, around industrial hazards or concentrated vibration, and no commercial driving secondary to history of blackouts; occasional climbing of stairs or ramps; occasional bending, twisting, stooping, kneeling, crouching or crawling; requires entry level work with 1-2-3 step procedures, no frequent changes in work routines, no requirement for problem solving, independent planning or the setting of goals; and only occasional interaction with the general public, co-workers or supervisors.

(ALJ Decision, Joint Appendix ("JA") 22.) According to Social Security Administration ("SSA") regulations,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The ALJ rejected the responses to the "Spinal Impairment Questionnaire" and the RFC findings submitted by Dr. Koford regarding Hash's back pain, determining that there was "no objective basis" for them. The ALJ also rejected the responses to the "Psychiatric/Psychological Impairment Questionnaire" and the RFC findings submitted by Dr. Hortoillosa regarding Hash's depression, concluding that they were inconsistent with the other evidence and unsupported by both treatment records and the diagnoses of major depression and mood disorder due to general medical condition. The ALJ also found that Hash had overstated "the intensity and persistence of his

symptoms," (JA 22), and he gave Hash's subjective statements little weight in determining Hash's RFC.

Hash appealed the ALJ's decision, and, on February 15, 2008, the magistrate judge rendered his R&R concluding that the Commissioner's decision should be affirmed. *Hash v. Astrue*, No. 1:07-cv-00125-J (W.D. Ky. 2008) (Doc. No. 15). The district court adopted the R&R in full and dismissed Hash's petition. Hash timely appealed.

## II. ANALYSIS

### A. Standard of Review

Under 42 U.S.C. § 405(g), our review of the Commissioner's decision is limited to determining whether the findings are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Cutlip v. Sec'y Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "Substantial evidence" means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* In determining whether substantial evidence exists, this Court must examine the administrative record as a whole. *Id.* We may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). If it is supported by substantial evidence, we must affirm the Commissioner's decision even if we would have decided the matter differently, and even if substantial evidence also supports the claimant's position. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986).

In DIB cases, the plaintiff has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability. 42 U.S.C. § 423(a); *Wyatt v. Sec'y Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The SSA defines a "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant has established disability, an ALJ undertakes a five-step sequential evaluation mandated by regulation. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe, medically determinable physical or mental impairment. *Id*. § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work; if the ALJ determines in the affirmative, the claimant is not disabled. *Id*. § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work; if the claimant can, then he or she is not disabled. *Id*. § 404.1520(a)(4)(v).

The claimant bears the burden of proving the first four steps, *Wilson*, 378 F.3d at 548 (citing *Walters*, 127 F.3d at 529), but at step five, the burden shifts to the Commissioner, who must identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational

profile. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). In many cases, the Commissioner may carry this burden by applying the medical-vocational grid at 20 C.F.R. Pt. 404, Subpt. P, App. 2, which directs a conclusion of "disabled" or "not disabled" based on the claimant's age and education and on whether the claimant has transferable work skills. *Wright v. Massanari,* 321 F.3d 611, 615 (6th Cir.2003); *Burton v. Sec'y of Health & Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990). However, if a claimant suffers from a limitation not accounted for by the grid, the Commissioner may use the grid as a framework for her decision but must rely on other evidence to carry her burden. *Burton*, 893 F.2d at 822. In such a case, the ALJ may rely on the testimony of a vocational expert in considering whether the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy. *Wilson*, 378 F.3d at 548 (citing *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 150 (6th Cir. 1996)).

In this case, the ALJ determined that Hash successfully established the first four steps of the sequential evaluation process, but, based on testimony by the vocational expert, denied Hash's claim at the fifth step. Thus, the only relevant issue for our review is whether the ALJ's determination that the Commissioner met her burden of showing that Hash can perform a significant number of jobs existing in the national economy is supported by substantial evidence. *See Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168 (6th Cir. 1990). Because Hash bases his appeal on the ALJ's rejection of the opinions by Drs. Koford and Hortoillosa, "treating physicians" under applicable SSA regulations, and the ALJ's finding that he was not credible, we have focused our review accordingly.

**B.      Physical Limitations**

Hash first asserts that the ALJ improperly discredited the opinion of Dr. Koford in determining that Hash's back injury did not prevent him from performing a significant range of "light work." We disagree.

Hash saw Dr. Koford for treatment of his lower back and leg pain from March 26, 2004 through January 18, 2005. Based on the results of Hash's 2002 MRI and CT scans, which Dr. Koford found to be compatible with lumbar degenerative disc disease, Dr. Koford recommended that Hash undergo physical therapy, and he adjusted Hash's pain medications. In November 2004, when Hash returned for a follow-up appointment, Dr. Koford diagnosed Hash with chronic low back pain with lumbar degenerative disc disease and facet arthropathy. Hash told Dr. Koford that he had voluntarily ceased physical therapy when it had worsened his pain but that the heat therapy, electrode therapy, and nerve blocks had provided him with some relief.

On January 18, 2005, Hash requested that Dr. Koford fill out the "Spinal Impairment Questionnaire" to be used at Hash's administrative hearing. Dr. Koford examined Hash and found that despite some tenderness, Hash had no muscle spasms, swelling, or palpable trigger points. Hash was able to perform a normal straight-leg raise, though the action was painful, and Hash's femoral stretch test—which is used to determine if a patient has muscle or nerve problems typically occurring with a herniated disc—was negative. Dr. Koford referred Hash to the Frazier Rehabilitation Institute for a functional capacity evaluation and to Dr. Arul Verghis, a back specialist, for possible additional facet joint injections.

Dr. Koford completed his responses to Hash's impairment questionnaire on April 14, 2005. At the time of completion, Dr. Koford had not seen Hash for over three months and had not reviewed

MRIs of Hash's spine that had been taken during that period. Dr. Koford's questionnaire responses noted that Hash could lift ten to twenty pounds occasionally, and five pounds frequently. Dr. Koford also found that Hash could sit at one hour intervals but would need to stand for ten minutes before he could sit again. Finally, Dr. Koford opined that Hash would need unscheduled breaks of at least ten minutes every hour to relieve his pain and that he would likely be absent from work due to pain more than three times per month.

The ALJ rejected Dr. Koford's questionnaire responses and RFC findings, reasoning that the "claimant was able to work at light duty (the claimant reported he performed adequately on light duty but had problems once he was put back on regular duty), go deer hunting and perform active activities of daily living." (JA 21.) The ALJ also determined that Dr. Koford's RFC findings were contrary to available objective medical evidence. Under SSA regulations, the opinion of a treating physician like Dr. Koford is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 460 (6th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)). Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions. *Id*. at 460-61. The SSA considers several factors to assess the weight of the opinion of the treating physician, including:

> (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion, with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the

specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Id*. at 461 (citing 20 C.F.R. §§ 404.1527(d)(2)-(6)).

The ALJ's determination of the physical limitations in Hash's RFC and his decision to discount Dr. Koford's questionnaire responses are supported by substantial evidence. Although Hash argues that Dr. Koford's evaluation was based on the results of MRI and CT tests, Hash does not point the Court to these results. In fact, the 2002 MRI of Hash's lumbar spine showed that disc space and alignment were "well maintained" with only "minimal" signal changes of the disc and "minimal" disc degeneration. Moreover, the 2002 MRI results revealed "normal" nerve root areas and "moderate" disc bulging with "minimal" effacement of the dural sac and without any other abnormalities. Hash's CT scan of his lumbar spine also showed only "mild" problems. Even when considered together, such "minimal" findings do not establish an objective basis for finding disabling limitations.

Also, in completing the questionnaire, Dr. Koford did not review the results of the 2005 MRI of Hash's spine, which suggests that he relied on outdated test results. Dr. Koford referred Hash to Dr. Verghis, a back specialist, in 2004. The 2005 MRI of Hash's lumbar spine showed marked improvement in Hash's condition, as did the 2005 MRI of Hash's thoracic spine, which showed no paraspinal masses, bony lesions, herniated discs, or significant spinal or neural foraminal stenosis. Again, these improvements do not support an objective basis for finding the existence of a "disabling" limitation. The record also suggests that although he referred Hash to Dr. Verghis, Dr. Koford never reviewed Dr. Verghis's clinical findings. Dr. Verghis determined that Hash had a

normal gait with only "mild" difficulty when he walked on his toes or heels, and despite having a decreased range of motion in his thoracic and lumbar spine, had normal muscle strength and reflexes in both his upper and lower extremities and a normal range of motion in his cervical spine. Dr. Verghis evaluated Hash's 2005 MRI results and found that Hash had normal strength in both his upper and lower extremities and no neurological problems. Although Dr. Verghis recommended that Hash return to him for follow-up treatment, Hash did not do so.

Moreover, Dr. Koford's own treatment notes from his examinations of Hash prior to his completion of the questionnaire are inconsistent with, and provide no objective basis for, his proposed disabling limitations. Dr. Koford had previously noted that Hash had only "mild tenderness" in his lower back, had a "normal" gait, and could stand on his heels and toes without problems. Dr. Koford never mentioned any limitations in Hash's ability to sit, stand, walk, or lift.

Although Hash contends that Dr. Koford's findings are supported by evaluations by occupational therapists he saw for physical therapy sessions at Frazier Rehabilitation Institute, providing that Hash could only stand for thirty minutes and walk for up to six minutes, the ALJ was entitled to discount their testimony. *See* 20 C.F.R. § 404.1513(a) ("occupational therapists" and "physical therapists" are not referenced as "acceptable medical sources" for making medical determinations under 20 C.F.R. § 404.1527); *Walters*, 127 F.3d at 530-31 (although a physical therapist can provide insight into the severity of a claimant's impairments and how they affect his ability to function, the ALJ is not required to give the physical therapist's findings controlling weight). Here, where the conclusions of the Frazier therapists were inconsistent with objective medical evidence, the ALJ was entitled to disregard them.

Finally, Hash's own reported daily activities also provide substantial evidence for the ALJ's rejection of Dr. Koford's assessment. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (noting that a claimant's participation in daily activities alone will not automatically disqualify him from a disability finding, but the ALJ may consider such activities in evaluating the veracity of his claim of disabling pain). Hash testified that on a "regular day," he spends the "biggest part of the day" in a recliner tilted to a 45-degree angle. (JA 388.) In that position, he typically watches television, reads the paper, and tries to "keep [himself] busy." (JA 389.) Hash also explained that his pain causes him to have difficulty sleeping, and he often takes a sleeping pill and spends two to three hours each night in the recliner. Hash stated that he could drive a car for thirty minutes at a time, make two-hour car trips (as a passenger), grocery shop occasionally, and walk up to two-hundred yards at a time. Although, Hash asserted that his back pain prevented him from actively participating in deer hunting, a sport he had enjoyed before his injury, medical records from a January 23, 2004 visit to an Adanta therapist indicate that he had hurt himself by falling in the woods while looking for a deer his daughter had shot.

Because the ALJ properly based his rejection of Dr. Koford's questionnaire and RFC findings on the objective medical evidence and Hash's statements about his daily activities, we uphold the ALJ's determination that Hash's physical limitations did not qualify him for DIB.

## C.     Mental Limitations

Hash also argues that the ALJ improperly discounted Dr. Hortoillosa's "Psychiatric/Psychological Impairment Questionnaire" and RFC findings. Again, we disagree.

12

Hash sought mental health treatment at Adanta for depression from 2003 through 2004. Though he had been taking anti-depressants since 1993, he claimed that his depression had been exacerbated by his inability to work due to his back pain, and he sought counseling to raise his self-esteem. Hash's initial Adanta mental status examination revealed that he had a flat affect and a depressed mood but fair judgment and insight. He was diagnosed with a mood disorder due to general medical condition, and his Global Assessment of Functioning ("GAF") score was assessed at 50.[1]

Hash continued to see numerous Adanta therapists, and was prescribed Paxil (for depression) and Trazodone (for insomnia). The Adanta therapists' evaluations reveal that by March 22, 2004, Hash showed signs of improvement, but soon after, he again reported depressive symptoms due to the added financial pressure he experienced following his back injury. Hash last visited Adanta in early April 2005, at which point he was assessed as calm and stable with a euthymic (neutral) affect.

After he had submitted all of his mental health records to the Commissioner and testified at the administrative hearing, Hash approached Dr. Hortoillosa, one of his Adanta psychiatrists, and asked him to complete a "Psychiatric/Psychological Impairment Questionnaire." Using Hash's own report and an unidentified "Bio psychosocial and health screening," Dr. Hortoillosa affirmed the diagnoses of single-episode depression, and mood disorder due to an underlying medical condition.

---

[1] The GAF scale reflects a clinician's assessment of an individual's overall level of functioning. *See* American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994). According to the American Psychiatric Association, a GAF score between 41 and 50 reflects "serious symptoms such as suicidal thoughts, severe obsessive rituals, or other serious impairments in social, occupational or school functioning." *Id*.

He reported that Hash had symptoms of "depressed mood and loss of interest or pleasure," "insomnia," "poor appetite," "self isolation," and "fatigue." Dr. Hortoillosa also indicated that Hash was "markedly limited" in his abilities to: maintain concentration, pay attention to and regularly attend work, work in proximity to others, make simple work-related decisions, complete a normal workday, accept instructions, get along with co-workers, respond appropriately to changes, and set realistic goals. Dr. Hortoillosa also opined that combined with his chronic back pain, Hash's depressive symptoms would likely make him incapable of tolerating even a low level of work-related stress.

Like Dr. Koford, Dr. Hortoillosa qualifies as a "treating physician" under the applicable regulations. *See* 20 C.F.R. §§ 404.1527(d)(2)-(6). Nonetheless, the ALJ was entitled to reject Dr. Hortoillosa's assessments as they were contrary to other substantial evidence in the record. *See Meece*, 192 F. App'x at 460. Dr. Edwards, a psychiatrist who examined Hash on October 5, 2003 at the Commissioner's request, opined that Hash could perform simple work-related tasks, ask simple questions, appropriately understand, remember, and follow simple commands, and work without special supervision. Dr. Edwards also noted that Hash could adapt to changes in a work setting without significant impairment, had appropriate social interaction, demonstrated "no distractability," and showed a good rate of concentration. Moreover, Dr. Edwards ultimately concluded that Hash had a GAF score of between 60 and 65, indicating only mild to moderate limitations.

Further, the reports by Drs. Scher and Perritt, non-examining medical consultants who completed mental RFC assessments of Hash, contravene Dr. Hortoillosa's questionnaire responses

14

and RFC. Both Drs. Scher and Perritt concluded, consistent with the objective clinical findings of

Dr. Edwards, that Hash could understand and remember short, simple instructions, sustain attention

to complete simple, repetitive tasks, tolerate coworkers and supervisors in a non-public setting, and

adapt to routine changes. Although Drs. Scher and Perritt are not "treating physicians"—each

evaluated Hash only one time—they are state agency psychological consultants who are experts in

disability evaluation, and the ALJ is required to consider their opinions in his evaluation of the

evidence. *See* 20 C.F.R. § 404.1527(f)(2)(i).

Dr. Hortoillosa's questionnaire responses are also inconsistent with his own Adanta treatment

notes, which suggest Hash's ongoing improvement. Though there is evidence that Hash "regressed"

in February 2005, this "regression" was closely followed by Dr. Hortoillosa's final Adanta treatment

note about Hash, which described Hash as calm, with a euthymic affect, and indicated that Hash's

depression was stable.

Finally, it is important to note that Dr. Hortoillosa based his evaluation only on Hash's own

report and one unspecified "Bio psychosocial and health screening." (JA 355.) Given the

inconsistencies in the objective medical evidence supporting Dr. Hortoillosa's evaluation, Hash has

failed to present evidence sufficient to overcome our deferential review of the ALJ's determination.

Thus, we uphold the ALJ's conclusion that Hash's mental limitations do not qualify him as

"disabled."

### D.     Credibility Findings

The final issue before us is whether substantial evidence supports the ALJ's finding that

Hash's subjective assessments of his symptoms were not entirely credible. Hash argues that the ALJ

failed to cite a single fact in support of his credibility determinations and that he should at least be forced to articulate a good faith basis for his conclusion.

A claimant's subjective assessment of his symptoms is relevant to determining whether he suffers from a disability but is not conclusive evidence of a disability. *Warner*, 375 F.3d at 392 (citing *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("Subjective complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.'") (quoting 42 U.S.C. § 423(d)(5)(A))). In evaluating the claimant's subjective complaints of pain, an ALJ may properly consider the claimant's credibility, and we accord great deference to that credibility determination. *Id.*; *see also Walters*, 127 F.3d at 531 (stating that an ALJ's "findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an [ALJ] is charged with the duty of observing a witness's demeanor and credibility"). A claimant's credibility may be properly discounted "to a certain degree . . . where an [ALJ] finds contradictions among the medical reports, claimant's testimony, and other evidence." *Warner*, 375 F.3d at 392 (quoting *Walters*, 127 F.3d at 531); *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (in evaluating his assertions of pain or ailments, an ALJ may also consider a claimant's household and social activities). An individual's statements as to "pain or other symptoms will not alone establish that [he is] disabled . . . ." *Walters*, 127 F.3d at 531 (quoting 20 C.F.R. § 404.1529(a)). This Court has developed a two-prong test to evaluate such assertions:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Id*. (citing *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994)).

The ALJ found objective medical evidence of Hash's underlying condition—degenerative disc disease and depressive mood disorder—but there is little or no objective medical evidence tending to confirm that the pain Hash attributed to these conditions is disabling. Without such evidence, this Court will generally defer to the ALJ's assessment. *See Blacha*, 927 F.2d at 231 (deferring to the ALJ's credibility analysis where there was no objective medical support to confirm the disabling effects of claimant's underlying medical condition). In this case, the ALJ's credibility findings are supported by the record. Hash's subjective complaints are inconsistent with the evidence, including objective diagnostic tests, such as MRIs and CT scans, Dr. Verghis's clinical findings, statements in Dr. Koford's treatment notes, the opinions of state agency medical and psychological consultants, the opinions of Dr. Edwards, several Adanta treatment notes, and Hash's own statements about his daily activities. In light of the foregoing, there is substantial evidence in the record to support the ALJ's decision to discount Hash's subjective complaints regarding the severity and frequency of his pain.

## V. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's decision.